**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| DENNIS BRENNAN, LAUREN BRADT, AND DEBRA WERNER, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br>v.<br><br>TOWER HEALTH SYSTEM, THE BOARD OF TRUSTEES OF TOWER HEALTH SYSTEM, THE FIDUCIARY COMMITTEE OF TOWER HEALTH SYSTEM, and JOHN DOES 1-20,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  CIVIL ACTION NO.: |

**CLASS ACTION COMPLAINT**

Plaintiffs, Dennis Brennan, Lauren Bradt, and Debra Werner ("Plaintiffs"), by and through their attorneys, on behalf of the Tower Health 403(b) Plan (the "Plan"),[1] themselves and all others similarly situated, state and allege as follows:

## I. INTRODUCTION

1. This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries, which include Tower Health System ("Tower Health" or "Company"), the Board of Trustees of Tower Health System and its members during the Class Period[2] ("Board") and the Fiduciary Committee of Tower Health System and its members during the Class Period (the "Committee").

---

[1] The Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party. Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

[2] As will be discussed in more detail below, the Class Period is defined as June 16, 2019 through the date of judgment ("Class Period").

2.     The Plan is a defined contribution plan, established pursuant to 29 U.S.C. § 1002(2)(A) and § 1002(34) of ERISA, that enables eligible participants to make tax-deferred contributions from their salaries to the Plan. *See* Independent Auditor's Report ("Auditor's Report"), attached to 2023 Form 5500 for the Plan, at 6 ("The Plan is a defined contribution plan subject to the provisions of the Employee Retirement Income Security Act of 1974.").

3.     To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B). These twin fiduciary duties are "the highest known to the law." *Sweda v. Univ. of Pennsylvania,* 923 F.3d 320, 333 (3d Cir. 2019).

4.     The Department of Labor ("DOL") has also explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting investment options and service providers."[3]; *see also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1823 (2015) ("*Tibble I*") (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

5.     Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of investment options.  "Wasting beneficiaries' money is imprudent.  In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs."  Uniform Prudent Investor Act (the "UPIA"), § 7.

6.     "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but

---

[3] *See* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Sept. 2019), at 2, available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited July 24, 2024).

also in monitoring and reviewing investments.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (*en banc*) (quoting Restatement (Third) of Trusts, § 90, cmt. b) ("*Tibble II*").[4]

7.      Because cost-conscious management is fundamental to prudence in the investment function the concept applies not only to investments, but to a fiduciary's obligation to continuously monitor all fees incurred by plan participants, including a plan's recordkeeping and administration fees ("RKA").

8.      Additional fees of only 0.18% or 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees … lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble II*, 843 F.3d at 1198 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

9.      The Supreme Court reiterated that interpreting "ERISA's duty of prudence in light of the common law of trusts" a fiduciary "has a continuing duty of some kind to monitor investments and remove imprudent ones" and a plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones. *Hughes v. Northwestern Univ.*, 2022 WL 19935, at *3 (2022).

10.      Plaintiffs allege that during the putative Class Period, Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties it owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*, failing to pay reasonable fees for RKA services with respect to the Plan, and failing to objectively

---

[4] *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at 2, available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited February 21, 2020) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan.").

and adequately review the Plan's investment portfolio, initially and on an ongoing basis, with due care to ensure that each investment option was prudent, in terms of performance.

11.    At all times during the Class Period, the Plan had significant assets under management. At the Plan's fiscal year end in 2019, the Plan had $492,637,342 in assets under management that were/are entrusted to the care of the Plan's fiduciaries. *See* 2019 Form 5500 for the Plan, Schedule H, at 2.

12.    By 2023, the Plan had $966,702,226 in assets under management. *See* 2023 Form 5500 for the Plan, Schedule H, at 2.

13.    The Plan is also large in terms of the number of its participants. At the Plan's fiscal year end in 2019, the Plan had 13,475 participants with account balances. *See* 2019 Form 5500 for the Plan, at 2. By 2023, the Plan had 16,325 participants with account balances. *See* 2023 Form 5500 for the Plan, at 2. In 2021, only 0.1 percent (844 of 641,747) of plans in the country had more than 10,000 plan participants.[5] In addition, this was true at the start of the Class Period in 2019 where only 0.1 percent (865 of 603,217) of 401(k) plans in the country had more than 10,000 plan participants.[6]

14.    The marketplace for retirement plan services is established and competitive. Accordingly, in addition to the large number of participants, the Plan had substantial bargaining power to obtain high-quality, low-cost RKA services. Defendants, however, did not try to reduce the Plan's expenses to ensure they were prudent. Rather, Defendants allowed unreasonable expenses to be charged to participants for RKA services from 2019 through at least 2023.

---

[5] *See* The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at Plans, 2021 at Ex. 1.2, p. 7., available at https://www.idc.org/system/files/2024-08/24-ppr-dcplan-profile-401k.pdf.

[6] *See* The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2019 at Ex. 1.2, p. 7, available at https://www.ici.org/system/files/2022-09/22-ppr-dcplan-profile-401k.pdf.

15. Defendants also caused the Plan to enter into an arrangement with Lincoln Financial Group Trust Company ("Lincoln"), a party in interest, under which Lincoln received millions of dollars in exchange for recordkeeping services rendered to the Plan. Defendants' conduct was especially egregious given that Lincoln received additional income from certain of the Plan's investment securities, described below. This arrangement with Lincoln is a prohibited transaction because it "amounts to a 'direct or indirect ... furnishing of services ... between the plan and a party in interest,' 29 U.S.C. § 1106(a)(1)(C)." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 601 (8th Cir. 2009).

16. With regard to the Plan's investments, Defendants breached their fiduciary duty of prudence by selecting and/or maintaining a guaranteed investment contract ("GIC") in the Plan with lower crediting rates compared to available similar or identical investments with higher crediting rates. The crediting rate is the guaranteed rate of return for the investment fund.

17. Among other imprudent investments, Defendants allowed substantial assets in the Plan to be invested in a separate account GIC with Lincoln Financial Group Trust Company (the "Lincoln GIC"), that provided significantly lower rates of return than comparable stable value funds that Defendants could have made available to Plan participants.

18. A prudent fiduciary would not have included this underperforming investment option that also carried significantly more risk than other investment options that had similar goals, *i.e.,* preservation of investment assets.

19. Lincoln benefited significantly from participants in the Plan investing in the Lincoln GIC. A prudent fiduciary who adequately monitored the Plan's investments and placed the interests of participants in the Plan above all would have recognized that the Lincoln GIC was benefitting Lincoln at the expense of the participants in the Plan. The investments in the Lincoln GIC were held and invested by Lincoln, which kept the spread (the difference between the amount

it earned on the investment and the amount it paid to the Plan's participants). The crediting rates that Lincoln provided to the Plan were and are so low that Lincoln reaped a windfall on the spread.

20.     Plaintiffs allege that during the putative Class Period, Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*, (1) failing to objectively and adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost and performance; (2) failing to control the Plan's recordkeeping and administration costs; and (3) engaging in prohibited transactions in violation of 29 U.S.C. § 1106 (a)(1)(C).

21.      Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duty of prudence, in violation of 29 U.S.C. § 1104. Their actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

22.     Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duty of prudence (Count I), failure to monitor fiduciaries (Count II) and violation of ERISA's prohibited transactions (Count III).

## II.     JURISDICTION AND VENUE

23.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

24.     This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

25.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.  Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## III.    PARTIES

### Plaintiffs

26.     Plaintiff, Dennis Brennan ("Brennan"), resides in Manheim, Pennsylvania. During his employment, Plaintiff Brennan participated in the Plan. Mr. Brennan invested in the Lincoln GIC in the Plan and suffered injury to his Plan account due to the significant underperformance of the Lincoln GIC. In addition, Plaintiff Brennan also suffered injury to his Plan account by paying excessive RKA costs.

27.     Plaintiff, Lauren Brandt ("Brandt"), resides in Spring City, Pennsylvania. During her employment, Plaintiff Brandt participated in the Plan. Ms. Brandt invested in the Lincoln GIC in the Plan and suffered injury to her Plan account due to the significant underperformance of the Lincoln GIC. In addition, Plaintiff Brandt also suffered injury to her Plan account by paying excessive RKA costs.

28.     Plaintiff, Debra Werner ("Werner"), resides in Pottstown, Pennsylvania. During her employment, Plaintiff Werner participated in the Plan. Ms. Werner invested in the Lincoln GIC in the Plan and suffered injury to her Plan account due to the significant underperformance of the Lincoln GIC. In addition, Plaintiff Werner also suffered injury to her Plan account by paying excessive RKA costs.

29.     Plaintiffs have standing to bring this action on behalf of the Plan because they participated in the Plan and were injured by Defendants' unlawful conduct.  Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their account currently, or

as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

30.     Plaintiffs did not have knowledge of all material facts (including, among other things, total plan recordkeeping and administration cost comparisons to similarly-sized plans or information regarding other available funds) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

### Defendants

#### Company Defendant

31.     Tower Health is the Plan sponsor and a named fiduciary with a principal place of business being Sixth Avenue and Spruce Street, West Reading, Pennsylvania. *See* 2023 Form 5500 of the Plan, at 1. Tower Health is a regional, integrated healthcare system that offers healthcare and wellness services to communities in Berks, Chester, Montgomery, and Philadelphia Counties in Pennsylvania.[7]

32.     "The Employer [Tower Health] has designated the following person or persons to take on the responsibilities of Plan Administrator . . . **Name:** Fiduciary Committee or its designee." Summary Plan Description for Tower Health 403(b) Plan, reflecting the terms of the plan effective as of April 1, 2022 ("SPD"), at 3.

33.     Tower Health appointed the Committee to, among other things, ensure that the investments available to Plan participants are appropriate, had no more expense than reasonable and performed well as compared to their peers and that the Plan paid a fair price for recordkeeping and administrative services. As will be discussed below, the Committee fell well short of these

---

[7] *See* https://towerhealth.org/about-tower-health  last accessed on June 10, 2025.

fiduciary goals. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

34. Accordingly, Tower Health during the putative Class Period is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because it had a duty to monitor the actions of the Committee.

35. For the foregoing reasons, the Company is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

**Board Defendants**

36. The Company's Board of Trustees appointed the Committee to, among other things, ensure that the investments available to Plan participants are appropriate, had no more expense than reasonable and performed well as compared to their peers and that the Plan paid a fair price for recordkeeping and administrative services. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

37. "The Plan is administered by the Fiduciary Committee which is a committee of the Board of Trustees of Tower Health System. The Committee . . . reports to the Board of Trustees." See Independent Auditor's Report ("Auditor's Report"), attached to 2023 Form 5500 for the Plan, at 7.

38. Accordingly, each member of the Board during the putative Class Period (referred to herein as John Does 1-10) is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each had a duty to monitor the actions of the Committee.

39. The Board and the unnamed members of the Board during the Class Period (referred to herein as John Does 1-10), are collectively referred to herein as the "Board Defendants."

**Committee Defendants**

40.    As discussed above, Tower Health, through its Board, appointed the Fiduciary Committee to, among other things, ensure that the investments available to Plan participants are appropriate, had no more expense than reasonable and performed well as compared to their peers and that the Plan paid a fair price for recordkeeping and administrative services. *See* Auditor's Report, attached to 2023 Form 5500 for the Plan, at 7 ("The Committee has the overall responsibility for the operation and administration of the Plan. The Committee determines appropriateness of the Plan's investment offerings, monitors investment performance.").

41.    The Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of Plan assets.

42.    The Committee and unnamed members of the Committee during the Class Period (referred to herein as John Does 11-20), are collectively referred to herein as the "Committee Defendants."

## IV.    CLASS ACTION ALLEGATIONS

43.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[8]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Tower Health 403(b) Plan, at any time between June 16, 2019 through the date of judgment (the "Class Period").

44.    The members of the Class are so numerous that joinder of all members is impractical.  The 2023 Form 5500 lists 16,325 Plan "participants with account balances as of the end of the plan year."  2023 Form 5500 at 2.

---

[8] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

10

45.    Plaintiffs' claims are typical of the claims of the members of the Class. Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiffs consistently with other Class members and managed the Plan as a single entity. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

46.    There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

A.    Whether Defendants are/were fiduciaries of the Plan;

B.    Whether Defendants breached their fiduciary duty of prudence by engaging in the conduct described herein;

C.    Whether the Company and Board failed to adequately monitor the Committee and other fiduciaries to ensure the Plan was being managed in compliance with ERISA;

D.    The proper form of equitable and injunctive relief; and

E.    The proper measure of monetary relief.

47.    Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation.  Plaintiffs have no interests antagonistic to those of other members of the Class. Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

48.    This action may be properly certified under Rule 23(b)(1).  Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the

11

members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

49.     In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## V.     THE PLAN

50.     The Plan is a defined contribution plan covering substantially all eligible employees of Centene. *See* SPD, at 5 ("This Plan is a defined contribution plan, which is intended to qualify under Section 403(b) of the Internal Revenue Code."); *see also* Auditor Report's, attached to 2023 Form 5500, at 7. ("The Plan is a defined contribution plan subject to the provisions of the Employee Retirement Income Security Act of 1974 ("ERISA").").

51.     The Plan was adopted by Tower Health to assist employees to prepare for retirement. *See* SPD, at 1 ("Tower Health has adopted the Tower Health 403(b) Plan (the "Plan") to help its employees save for retirement.").

52.     Included in the Plan's available funds was the Group Fixed Annuity Contract with Lincoln. See Auditor's Report, attached to 2023 Form 5500 for the Plan, at 12 ("The Group Fixed Annuity Contract is a stable value product with a guaranteed rate of return and a guarantee of principal that is backed by Lincoln Financial Group Trust Company.").

53.     By the end of 2023, over $34 million in Plan assets were invested in the Lincoln GIC. *See* Auditor's Report, attached to 2023 Form 5500 for the Plan, at 14.

12

54.    The chart below demonstrates the amount of Plan assets invested in the Lincoln GIC during the Class Period.

| Plan Year | Plan Assets in Lincoln GIC |
|-----------|---------------------------|
| 2019 | $21,717,106 |
| 2020 | $31,450,345 |
| 2021 | $32,702,675 |
| 2022 | $36,929,652 |
| 2023 | $34,608,657 |

*Eligibility*

55.    In general, the Plan covers all employees of Tower Health and health care providers that are members of Tower Health. *See* SPD, at 10 ("To participate under the Plan, you must be an Eligible Employee. For this purpose, you are considered an Eligible Employee if you are an employee of any of the following employers … [listing health care providers].").

*Contributions*

56.    Eligible employees may elect to make contributions to their Plan accounts. *See* SPD, at 4 ("[Y]ou are eligible to make Salary Deferrals to the Plan. To begin making Salary Deferrals, you must complete a Salary Deferral election requesting that a portion of your compensation be contributed to the Plan instead of being paid to you as wages.").

57.    There is an automatic contribution function of the Plan. *See* SPD, at 6 ("[T]he Plan is set up with an 'automatic' deferral feature. Under this feature, you do not have to make a Salary Deferral election to begin deferring under the Plan. Thus, if you have otherwise satisfied the eligibility requirements for Salary Deferrals …, we will automatically withhold 6% of your Plan Compensation from each paycheck and deposit such amounts into the Plan as a Salary Deferral."); see also Auditor's Report, attached to 2023 Form 5500 for the Plan, at 8 ("Newly hired employees are automatically enrolled into the Plan with a 6% deferral … with an automatic annual increase of 1% until the participant reaches 10% of compensation.").

13

58.     Tower Health may make employer contributions to the Plan. See SPD, at 8 ("We are authorized under the Plan to make Employer Contributions on behalf of our employees."); *see also* Auditor's Report, at 8 ("Effective January 1, 2021, all employer contributions are not required to be paid but shall be at the discretion of the President and CEO of Tower Health. … Active participants who make an elective deferral receive a 50% employer match of the deferral to a maximum of 4% of compensation.").

59.     Like other companies that sponsor 403(b) plans for their employees, Tower Health enjoys both direct and indirect benefits by providing matching contributions to Plan participants. Employers are generally permitted to take tax deductions for their contributions to 403(b) plans at the time when the contributions are made. *See generally,* https://www.irs.gov/retirement-plans/irc-403b-tax-sheltered-annuity-plans#:~:text=A%20403(b)%20plan%20(tax%2Dsheltered%20annuity%20plan,their%20salary%20into%20individual%20accounts..

60.     Tower Health also benefits in other ways from the Plan's matching program.  It is well-known that "[o]ffering retirement plans can help in employers' efforts to attract new employees and reduce turnover." *See,* https://www.paychex.com/articles/employee-benefits/employer-matching-401k-benefits.

61.     Given the size of the Plan, Tower Health likely enjoyed a significant tax and cost savings from offering a match.

## VI.    THE TOTALITY OF THE CIRCUMSTANCES DEMONSTRATES THAT DEFENDANTS FAILED TO ADMINISTER THE PLAN IN A PRUDENT MANNER

### A.    ERISA Fiduciaries Are Held to the Highest Standards Regarding Process and Methodology of Evaluating Investments

62.     As described in the "Parties" section above, Defendants were fiduciaries of the Plan.

14

63.     ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted).  In addition to a duty to select prudent investments, under ERISA, a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 135 S. Ct. at 1828; *see also Hughes*, 142 S. Ct. at 741.

64.     As stated by the DOL: ERISA "requires plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest of the plan's participants and beneficiaries. Responsible plan fiduciaries also must ensure that arrangements with their service providers are 'reasonable' and that only 'reasonable' compensation is paid for services. …" DOL 408(b)(2) Regulation Fact Sheet.

65.     The duty "…to act solely in the best interest of participants has been a key tenet of ERISA since its passage." "Best Practices for Plan Fiduciaries," at 36, published by Vanguard, 2019.[9]

66.     Acting in the sole interest of plan participants is all encompassing. A fiduciary must monitor all investment options in a 403(b) plan as a prudent investment professional. *See* the U.S. Department of Labor, Employee Benefits Security Administration (EBSA)'s "Meeting Your Fiduciary Responsibilities," at 2 ("The duty to act prudently is one of a fiduciary's central responsibilities under ERISA. It requires expertise in a variety of areas, such as investments."), available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities.pdf.

67.     A prudent investment professional, and hence a fiduciary, must regularly evaluate a fund's performance history, the portfolio manager's experience and tenure, changes to the fund's

---

[9] Available at https://institutional.vanguard.com/iam/pdf/FBPBK.pdf?cbdForceDomain.

investment strategy, changes to the underlying assets in the investment, total assets under management within the fund, fees, and other relevant factors.

68.    With respect to investment returns, diligent investment professionals monitor the performance of their selected investments using appropriate industry-recognized "benchmarks" and prudently managed equivalents.

69.    The measurement of investments against prudently managed alternatives is critical given that these alternatives represent other investments available to a plan, which may increase the likelihood that participants reach/live their preferred lifestyle in retirement.

70.    Whether a plan fiduciary enlists the assistance of an investment manager, consultant, or advisor, the plan's fiduciaries are not relieved of fiduciary liability for selecting and monitoring the plan's investment options.

71.    It is black letter law that a fiduciary's duty to conduct an "independent investigation into the merits of a particular investment," is the "most basic of ERISA's investment fiduciary duties." *In re Unisys Savings Plan Litigation*, 74 F.3d 420, 435 (3d Circ. 1996). *Hughes*, 142 S. Ct. at 738 (noting ERISA fiduciaries are required to "conduct their own independent evaluation to determine which investments may by prudently included in the plan's menu of options.").

72.    To the extent plan fiduciaries have adopted an investment policy statement, those fiduciaries "must comply with the plan's written statements of investment policy, insofar as those written statements are consistent with the provisions of ERISA." *Lauderdale v. NFP Retirement, Inc.*, 2022 WL 17260510, at * 10 (S.D. Cal. Nov. 17, 2022). That is, the investment policy statement must be written with the sole interest of the plan participant in mind.

73.    Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for selecting, monitoring, and removing Plan investments or monitoring recordkeeping and administration costs, because this information is solely within the possession

16

of Defendants prior to discovery.  *See Braden v. Wal-mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.").

74.     Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for selecting, monitoring, and removing the Plan's investments because this information is solely within the possession of Defendants prior to discovery. *See Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.").

75.     Reviewing meeting minutes, when they exist, is the bare minimum needed to peek into a fiduciary's monitoring process. But in most cases even that is not sufficient.  For, "[w]hile the absence of a deliberative process may be enough to demonstrate imprudence, the presence of a deliberative process does not … suffice in every case to demonstrate prudence.  Deliberative processes can vary in quality or can be followed in bad faith.  In assessing whether a fiduciary fulfilled her duty of prudence, we ask 'whether a fiduciary employed the *appropriate* methods to investigate and determine the merits of a particular investment,' not merely whether there were any methods whatsoever." *Sacerdote et al. v. New York Univ.*, 9 F.4th 95, 111 (2d Cir. 2021) (emphasis in original).

76.     For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon several factors.

77.     Defendants' breaches of their fiduciary duties, relating to their overall decision-making, resulted in, *inter alia*, the selection (and maintenance) of the Lincoln GIC in the Plan

17

throughout the Class Period that wasted the assets of the Plan and the assets of participants because of unnecessary costs and underperformance.

**B.      Defendants Breached Their Fiduciary Duties by Causing the Plan to Offer the Lincoln GIC**

**1.      Overview of GICs**

78.      GICs fall under the category of capital preservation investment products. For defined-contribution retirement plans, stable value investments are intended to provide participants with an option that protects their assets and is shielded from risks of loss, hence why they are called Guaranteed Investment Contracts or GICs.

79.      In other words, a stable value fund "can generally be labeled as a conservative, fixed income investment vehicle with an objective of preserving capital while providing a relatively stable rate of return that generally exceeds the returns provided by money market funds."[10]

80.      GICs are issued by insurance companies mostly in the form of a fixed annuity contract. Pursuant to the terms of those contracts, the GICs provide for a guaranteed rate of return or "crediting rate" during a specified period.

81.      There are several different types of stable value investments in the retirement plan marketplace. Large plans often offer "synthetic" stable value funds, which are the least risky, because principal is guaranteed by multiple "wrap providers" and the fund owns the assets of the underlying funds.

82.      Separate account products, where the assets of the underlying funds are held in the separate account of an insurance carrier are riskier, because there is only one "wrap" provider. For separate account GICs, the insurer's payment obligations are putatively backed by a separate

---

[10] ERISA Advisory Council Report on Stable Value Funds and Retirement Security in the Current Economic Conditions, https://www.dol.gov/agencies/ebsa/about-ebsa/about-us/erisa-advisory-council/2009-stable-value-funds-and-retirement-security-in-the-current-economic-conditions.

account, which is less susceptible to claims and liabilities against the insurer. As a result, separate account GICs offer higher crediting rates.

83. And General account products, where the funds are held unrestricted in the general account of the insurance carrier, are the riskiest type of stable value funds, because they are more vulnerable to single entity credit risk and are riskier than separate account GICs. Consequently, general account GICs offer the highest rates.

84. Because the funds are kept in unrestricted accounts, they are generally subject to claims and liabilities asserted against the insurer. Such funds are subject to single entity credit risk, meaning the insurer is the sole entity responsible for paying such funds. If the insurer fails to pay funds, no other entity will satisfy the loan.

85. "When evaluating a traditional GIC, the most important consideration for the fiduciary-along with the contract terms-is the insurer's financial strength rating since an insurer's general account backs the guarantee that is at the core of this product."[11]

### 2. The Plan's Inclusion of the Lincoln GIC

86. At all relevant times, Defendants maintained the authority to exercise control over the Plan's investments, including the Lincoln GIC.

87. Lincoln establishes the crediting rate for the Lincoln GIC.

88. Lincoln earns a "spread" equal to the difference between the crediting rate and the returns the Lincoln earns on the funds in its account.

89. As indicated above, the Plan was invested in a group fixed annuity contract managed by Lincoln.

90. There are two significant problems with the Lincoln GIC. First, the Lincoln GIC is a traditional GIC and is structured as a general account, fixed annuity contract. As a general

---

[11] https://www.dol.gov/agencies/ebsa/about-ebsa/about-us/erisa-advisory-council/2009-stable-value-funds-and-retirement-security-in-the-current-economic-conditions.

account product, the Lincoln GIC thus has the following characteristics: single-entity credit risk,

plan-level illiquidity, lack of Plan participant ownership and investment control over assets, and

lack of transparency as to fees. The second, related problem with the Lincoln GIC is that its

crediting rates (*i.e.*, rates of return on investment) were/are well below what Defendants could

have obtained for the Plan participants on the open market.

### 3. There are Many GICs in the Marketplace with Competitive Crediting Rates

91.    The marketplace for GICs is robust with many insurance companies offering GICs

with competitive rates.

92.    Throughout the Class Period, identical or substantially identical stable value funds

with higher crediting rates, and hence lower spreads, were available to the Plan, but were not

selected by Defendants.

93.    The Lincoln GIC in the Plan is a general account product that should have had a

high crediting rate given its riskiness, yet it had underwhelming crediting rates when compared

against GICs with similar or lower riskiness provided by other comparable carriers for other

retirement plans:

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate[12] |
|---|---|---|---|---|---|
| **2019** | Baylor College of Medicine Retirement Plan | 12,587 | $1,278,730,175 | Lincoln Financial Group | 4.29% |
| | Jackson National Life Insurance Company Defined Contribution Plan | 5,002 | $1,090,110,381 | Jackson National Life Insurance | 4.28% |

---

[12] For crediting rates not identified in the plans' Form 5500s, the calculated yield is interest credited divided by the end of year balance.

| | | | | | |
|---|---|---|---|---|---|
| | Holzer Health System 401(a) Profit Sharing Plan | 1,896 | $179,609,420 | American United Life Insurance Company | 3.98% |
| | Transamerica 401(k) Retirement Savings Plan | 15,140 | $2,020,965,905 | Transamerica Financial Life Insurance Company | 3.85% |
| | American United Life Progress Sharing Plan and Trust | 3,051 | $377,919,056 | American United Life Insurance Company | 3.70% |
| | HCC Insurance Holdings Inc. 401(k) Plan | 2,515 | $355,957,124 | Massachusetts Mutual Life Insurance Company | 3.56% |
| | **Tower Health 403(b) Plan** | **13,475** | **$492,637,342** | **Lincoln GIC** | **2.45%** |
| | | | | | |
| 2020 | Baylor College of Medicine Retirement Plan | 12,905 | $1,493,377,139 | Lincoln Financial Group | 4.16% |
| | HCC Insurance Holdings Inc. 401(k) Plan | 2,711 | $428,308,461 | Massachusetts Mutual Life Insurance Company | 3.56% |
| | American United Life Progress Sharing Plan and Trust | 2,699 | $435,970,029 | American United Life Insurance Company | 3.54% |
| | **Tower Health 403(b) Plan** | **12,700** | **$755,601,344** | **Lincoln GIC** | **2.37%** |
| | | | | | |
| 2021 | Gemba Group Annuity Plan | 969 | $118,565,852 | National Ohio Financial Services | 4.97% |

| | | | | | |
|---|---|---|---|---|---|
| | Baylor College of Medicine Retirement Plan | 13,391 | $1,692,013,731 | Lincoln Financial Group | 4.23% |
| | Holzer Health System 401(a) Profit Sharing Plan | 2,017 | $203,815,263 | American United Life Insurance Company | 4.02% |
| | American United Life Progress Sharing Plan and Trust | 3,183 | $493,267,284 | American United Life Insurance Company | 3.87% |
| | Gemba Group Annuity Plan | 969 | $118,565,852 | Principal Life Insurance Company | 3.84% |
| | **Tower Health 403(b) Plan** | **16,240** | **$891,861,154** | **Lincoln GIC** | **1.85%** |
| | | | | | |
| 2022 | International Imaging Materials Inc. Retirement and Investment Plan | 445 | $59,443,888 | Lincoln National Life Insurance Co. | 4.89% |
| | Baylor College of Medicine Retirement Plan | 14,036 | $1,434,738,254 | Lincoln Financial Group | 4.37% |
| | American United Life Progress Sharing Plan and Trust | 3,235 | $439,262,320 | American United Life Insurance Company | 3.90% |
| | Jackson National Life Insurance Company Defined Contribution Plan | 4,650 | $1,149,061,601 | Jackson National Life Insurance | 3.83% |

| Year | Plan | | | | |
|---|---|---|---|---|---|
| | Alina 401(k) Retirement Savings Plan | 34,554 | $2,678,277,538 | Brighthouse Life Insurance Company | 3.69% |
| | Trugreen Profit Sharing and Retirement Plan | 11,408 | $371,495,784 | Massachusetts Mutual Life Insurance Company | 3.67% |
| | **Tower Health 403(b) Plan** | **16,397** | **$787,576,372** | **Lincoln GIC** | **1.39%** |
| 2023 | Valley Hospital Retirement Defined Contribution Plan | 4,282 | $550,230,744 | Lincoln National Life Insurance Co. | 4.57% |
| | Mattel, Inc. Personal Investment Plan | 7,427 | $1,167,576,000 | Metropolitan Tower Life Insurance Co. | 3.71% |
| | Pomona Valley Hospital Medical Center Retirement Savings Plan | 4,219 | $525,201,271 | Lincoln National Life Insurance Co. | 3.64% |
| | Auto-Owners Insurance Company Retirement Savings Plan | 8,582 | $772,874,102 | Auto-Owners Life Insurance Company | 3.48% |
| | **Tower Health 403(b) Plan** | **16,325** | **$966,702,226** | **Lincoln GIC** | **2.10%** |

94. Throughout the Class Period, the Lincoln GIC in the Plan underperformed the comparator funds by an average of over 45%, as demonstrated in the table below.

| Year | Lincoln GIC Rate of Return in the Plan | Comparator Average Rate of Return | Lincoln GIC Percentage of Underperformance in the Plan |
|---|---|---|---|

| 2019 | 2.45% | 3.94% | 37.82% |
|------|-------|-------|--------|
| 2020 | 2.37% | 3.75% | 36.80% |
| 2021 | 1.90% | 4.19% | 54.65% |
| 2022 | 1.50% | 4.06% | 63.05% |
| 2023 | 2.56% | 3.85% | 33.51% |
| Average Underperformance during Class Period | | | 45.17% |

95.    In short, because the Plan held between $492 million and $966 million in assets under management throughout the Class Period, it had considerable leverage to bargain for higher crediting rates.

### C.    Defendants Committed a Prohibited Transaction Resulting in Excessive RKA costs for the Plan and its Participants

96.    During the Class Period, Defendants entered into a contract with Lincoln to provide RKA services to the Plan. However, such an engagement is a prohibited transaction under ERISA.

97.    29 U.S.C. §§ 1106(a)(1)(C) provides that "(1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect … (C) furnishing of goods, services, or facilities between the plan and a party in interest."

98.    Here, Lincoln was a party in interest to the Plan as it was receiving compensation for RKA services, as well as indirect compensation from the Plan in the form of revenue share being paid to Lincoln from Lincoln funds in the Plan.

### 1.    Costs for Recordkeeping Services Vary Little Between Competing Providers for a Plan with a Substantial Number of Participants

99.    The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper." Recordkeeping and administrative services fees are one and the same and the terms are used synonymously herein and referred to as RKA.

100.    There are two types of essential recordkeeping services provided by all national recordkeepers for large plans with substantial bargaining power (like the Plan). First, an overall suite of recordkeeping services is provided to large plans as part of a "bundled" fee for a buffet style level of service (meaning that the services are provided, in retirement industry parlance, on an "all-you-can-eat" basis), including, but not limited to, the following services:

A.    Basic account recordkeeping (e.g. demographic, source, investment and vesting records);

B.    Multi-channel participant and plan sponsor access (e.g. phone, web);

C.    Daily participant transaction accounting (e.g., purchases, redemptions, exchanges);

D.    Payroll service (e.g. hardships, in-service withdrawals, termination distributions);

E.    Participant tax reporting services (e.g., IRS Form 1099-R);

F.    Participant confirmations, statements, and standard notices;

G.    Plan-level reporting and annual financial package (excluding IRS Form 5500);

H.    Participant education (e.g. newsletters, web articles, standard communication materials);

I.    Plan consulting (e.g., preapproved document services, operational materials);

J.    Plan consulting (e.g. preapproved document services, operational compliance support).

101.    This suite of essential recordkeeping services can be referred to as "Bundled" services. These services are offered by all recordkeepers for one price (typically at a per capita price), regardless of the services chosen or utilized by the plan. As explained in more detail below,

25

the services chosen by a large plan do not affect the amount charged by recordkeepers for such basic and fungible services.

102.   The second type of essential recordkeeping services, hereafter referred to as "A La Carte" services, provided by all national recordkeepers, often has separate, additional fees based on the conduct of individual participants and the usage of the services by individual participants. These fees are distinct from the bundled arrangement described above to ensure that one participant is not forced to help another cover the cost of, for example, taking a loan from their plan account balance. These A La Carte services typically include, but are not limited to, the following:

    a.   Loan processing;

    b.   Brokerage services/account maintenance (if offered by the plan);

    c.   Distribution services; and

    d.   Processing of qualified domestic relations orders.

103.   All national recordkeepers have the capability to provide all of the aforementioned recordkeeping services at very little cost to all large defined contribution plans, including those much smaller than the Plan. In fact, several of the services, such as managed account services, self-directed brokerage, Qualified Domestic Relations Order processing, and loan processing are often a profit center for recordkeepers.

104.   The cost of providing recordkeeping services depends in large part on the number of participants in a plan. Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee. *See* 1998 DOL Study,[13] at 4.2.2. ("Basic per-participant administrative charges typically reflect minimum charges and sliding scales that substantially reduce per capita costs as plan size increases."). When more participants in a plan are on a recordkeeping platform, the recordkeeper allocates its fixed costs over a larger

---

[13] https://www.dol.gov/sites/dolgov/files/EBSA/researchers/analysis/retirement/study-of-401k-plan-fees-and-expenses.pdf ("1998 DOL Study").

participant base, which reduces the per-participant cost. As a result, the cost to add a new participant to a plan is relatively low. And as the overall number of participants increases, the average cost per participant decreases. ***Because recordkeeping expenses are driven by the number of participants in a plan, the vast majority of plans are charged on a per-participant basis.***[14]

105.   In general, the level, number and character of participant services provided by the recordkeeper have minimal impact upon the costs of providing recordkeeping. That is because building and maintaining a robust, intuitive, web-based participant interactive 401(k) account system incurs large fixed costs. Each additional participant placed on the system causes a minimal incremental/marginal cost to the record keeper ***notwithstanding the level, number and character of the services provided to that additional participant.***

106.   Recordkeepers for large 401(k) plans and 403(b) plans such as Fidelity, Vanguard, Empower, and Voya, among others, invest in technology infrastructure necessary to provide recordkeeping and transaction services to all clients (*e.g.*, website, call center, and some print services).

107.   Accordingly, a plan sponsor or fiduciary has the leverage to negotiate favorable rates given that costs of implementation do not change for the service provider.

### 3.    The Plan's Recordkeeping Fees were Excessive

108.   Because recordkeeping costs are not affected by account size, prudent fiduciaries of defined contribution plans negotiate recordkeeping fees as a fixed dollar amount rather than as a percentage of assets. *See* Mercer Best Practices at 3. Otherwise, as plan assets grow, the

---

[14] "[T]he actual cost of administrative services is more dependent on the number of participants in the plan." There is no "logical or practical correlation between an increase in administrative fees and an increase in plan assets." Hewitt Associates, LLC, *Be a Responsible Fiduciary: Ask the Right Questions About 401(k) Plan Fees*, Oct. 2008; *see also* Mercer Investment Consulting, Inc., *DC Fee Management – Mitigating Fiduciary Risk and Maximizing Plan Performance* (2013), https://www.mercer.com/content/dam/mercer/.

recordkeeping compensation increases without any change in the recordkeeping services, leading to unreasonable fees.

109. As demonstrated in the charts below, the Plan's participants were saddled with above-market administrative and recordkeeping fees throughout the Class Period.

110. The Plan's per participant RKA fees were as follows:

| Plan Year | Participants | Total RKA Reported | $PP |
|---|---|---|---|
| 2019 | 13,475 | $1,087,333 | $80.69 |
| 2020 | 12,700 | $1,057,047 | $83.23 |
| 2021 | 16,240 | $1,094,929 | $67.42 |
| 2022 | 16,397 | $1,099,686 | $67.07 |
| 2023 | 16,325 | $1,120,607 | $68.64 |

111. Looking at recordkeeping costs for plans similar in size to the combined assets and participant size of the Plan during the Class Period shows that the Plan was paying higher recordkeeping fees than their peers.

| Recordkeeper | Plan Name | Plan Year | Assets Under Management | Participants | Schedule C Codes | Indirect Compensation | Cost Per Participant[15] |
|---|---|---|---|---|---|---|---|
| Fidelity | Optumcare Management, LLC 401(k) Retirement Savings Plan | 2019 | $843,224,007 | 10,072 | 37 60 64 65 71 | Yes - $0 | $22 |
| Vanguard | FedEx Office and Print Services, Inc. 401(k) Retirement Savings Plan | 2019 | $939,399,569 | 18,674 | 15 16 21 25 26 37 50 52 57 | Yes - $0 | $25 |
| Fidelity | Pacific Architects and Engineers, LLC 401(k) Savings Plan | 2019 | $435,391,716 | 14,698 | 37 60 64 65 71 | Yes - $0 | $23 |
| Fidelity | First American Financial Corporation 401(k) Savings Plan | 2019 | $1,791,281,396 | 15,246 | 37 60 64 65 71 | Yes - $0 | $35 |
| Great-West Life/ TIAA | Penn State Health 401(k) Savings Plan | 2019 | $1,646,231,456 | 15,020 | 64 | Yes - $0 | $35 |
| **Lincoln** | **Tower Health 403(b) Plan** | **2019** | **$492,637,342** | **13,475** | **13 37** | **Yes - $0** | **$81** |

[15] Unless otherwise noted, these fees are taken from the Form 5500.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Fidelity | Optumcare Management, LLC 401(k) Retirement Savings Plan | 2020 | $938,281,291 | 9,832 | 37 60 64 65 71 | Yes - $0 | $19 |
| Vanguard | FedEx Office and Print Services, Inc. 401(k) Retirement Savings Plan | 2020 | $1,051,387,744 | 19,354 | 15 16 21 25 26 37 50 52 57 | Yes - $0 | $23 |
| Fidelity | Pacific Architects and Engineers, LLC 401(k) Savings Plan | 2020 | $493,950,650 | 7,597 | 37 60 64 65 | Yes - $0 | $28 |
| Fidelity | PG&E Corporation Retirement Savings Plan | 2020 | $3,781,395,000 | 12,273 | 37 64 65 71 | No | $29 |
| Great-West | Viacom 401(k) Plan | 2020 | $1,747,213,865 | 12,469 | 15 37 50 64 | No | $37 |
| **Lincoln** | **Tower Health 403(b) Plan** | **2020** | **$755,601,344** | **12,700** | **13 37** | **Yes - $0** | **$83** |
| Vanguard | Crowe LLP Retirement Plan | 2021 | $1,021,351,197 | 6,840 | 15 33 37 99 | Yes - $0 | $27 |
| Fidelity | Optumcare Management, LLC 401(k) Retirement Savings Plan | 2021 | $1,341,037,601 | 10,170 | 37 60 64 65 71 | Yes - $0 | $28 |
| Fidelity | Pacific Architects and Engineers, LLC 401(k) Savings Plan | 2021 | $693,883,632 | 14,583 | 37 60 64 65 | Yes - $0 | $5 |
| Fidelity | The Tax Sheltered Annuity Plan of Texas Children's Hospital | 2021 | $1,706,447,554 | 15,788 | 37, 60, 64, 65, 71 | Yes - $0 | $26 |
| Fidelity | Fortive Retirement Savings Plan | 2021 | $1,987,784,377 | 12,758 | 37, 64, 65, 71 | No | $34 |
| Fidelity | PG&E Corporation Retirement Savings Plan | 2021 | $4,285,161,000 | 12,994 | 37 64 65 71 | No | $33 |
| **Lincoln** | **Tower Health 403(b) Plan** | **2021** | **$891,861,154** | **16,240** | **13 37** | **Yes - $0** | **$67** |
| Fidelity | The Tax Sheltered Annuity Plan of Texas Children's Hospital | 2022 | $1,475,238,032 | 16,973 | 37, 60, 64, 65, 71 | Yes - $0 | $29 |
| Vanguard | Crowe LLP Retirement Plan | 2022 | $992,984,046 | 7,584 | 15 33 37 99 | Yes - $0 | $26 |
| Fidelity | Optumcare Management, LLC 401(k) Retirement Savings Plan | 2022 | $1,099,817,927 | 11,787 | 37 60 64 65 71 | Yes - $0 | $30 |

| Vanguard | Vista Outdoor Inc. 401(k) Plan | 2022 | $440,444,788 | 7,295 | 15 16 33 37 38 99 | Yes - $0 | $33 |
|---|---|---|---|---|---|---|---|
| T. Rowe Price | Expeditors International of Washington, Inc. 401(k) Plan | 2022 | $839,061,386 | 9,597 | 15 21 25 28 37 38 49 50 52 59 62 64 65 | Yes - $0 | $31 |
| **Lincoln** | **Tower Health 403(b) Plan** | **2022** | **$787,576,372** | **16,397** | **13 37** | **Yes - $0** | **$67** |
| | | | | | | | |
| Fidelity | The Tax Sheltered Annuity Plan of Texas Children's Hospital | 2023 | $1,837,546,518 | 18,163 | 37, 60, 64, 65, 71 | Yes - $0 | $32 |
| Fidelity | Fortive Retirement Savings Plan | 2023 | $1,915,519,824 | 13,503 | 37, 64, 65, 71 | Yes - $0 | $30 |
| **Lincoln** | **Tower Health 403(b) Plan** | **2023** | **$966,702,226** | **16,325** | **13 37** | **Yes - $0** | **$69** |

112. The above chart demonstrates that for similar plans, regarding assets and participants, the Plan had one of the highest recordkeeping fees over the course of the Class Period.

113. The Plan's $73 per participant average fee from 2019 to 2023 is 161% greater than the average fee of $28 per participant from 2019 to 2023 for the twenty-three (23) plans listed above.

114. This vast discrepancy between the Plan's RKA fees and comparable plans existed for all years from 2019 through 2023. Indeed, the figures in the above chart are just an example of the Plan's excessive RKA fees from 2019 through 2023.

115. The Plan should have been able to obtain per participant recordkeeping fees of no more than $28 per participant, and likely even less. This fee is consistent with the average recordkeeping fees paid by similar plans in the country as demonstrated in the allegations above.

116. Further, because Lincoln was a party-in-interest and received income from the funds it maintained in the Plan, the Plan's fiduciaries should have taken these additional sources of income into consideration to reduce the excessive RKA fees paid to Lincoln.

117. Given the size of the Plan's assets during the Class Period and total number of participants, in addition to the general trend towards lower recordkeeping expenses in the

marketplace as a whole, the Plan could have obtained recordkeeping services that were comparable to or superior to the typical services provided by the Plan's recordkeeper at a lower cost.

**COUNT I**
**Breaches of Fiduciary Duty of Prudence**
**(against the Committee)**

118.   Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

119.   At all relevant times, the Committee and its members ("Prudence Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that it exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

120.   As fiduciaries of the Plan, the Prudence Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of Plan's participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

121.   The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint. Prudence Defendants did not make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the interest of Plan's participants. Instead, the Prudence Defendants selected and retained investment options in the Plan despite poor performance in relation to other comparable investments.

122.   As a direct and proximate result of the breaches of fiduciary duties alleged herein related to the Lincoln GIC, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns. Had Prudence Defendants complied with their fiduciary

31

obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

123.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

124.    The Prudence Defendants knowingly participated in each breach, knowing that such acts were a breach, and failed to make any reasonable and timely effort under the circumstances to remedy the breaches.

### COUNT II
### Failure to Adequately Monitor Other Fiduciaries
### (against the Company and the Board)

125.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

126.    Tower Health, through its Board (the "Monitoring Defendants") had the authority to appoint and remove members of the Committee, and the duty to monitor the Committee and were aware that the Committee had critical responsibilities as fiduciaries of the Plan.

127.    In light of this authority, the Monitoring Defendants had a duty to monitor the Committee to ensure that the Committee was adequately performing its fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee was not fulfilling those duties.

128.    The Monitoring Defendants also had a duty to ensure that the members of the Committee possessed the needed qualifications and experience to carry out their duties; had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to the Company.

129.    The Monitoring Defendants breached their fiduciary monitoring duties by, among other things, failing to monitor and evaluate the performance of the Committee or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee's imprudent actions and omissions.

130.    As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars in losses. Had the Monitoring Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

131.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the Committee. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

**COUNT III**
**Prohibited Transactions**
**(Against All Defendants)**

132.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

133.    ERISA § 406(a)(1), 29 U.S.C. § 1106(a)(1), provides, in pertinent part, that "a fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . . (C) furnishing of goods, services, or facilities between the plan and a party in interest; [or] (D) transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan and a party in interest."

134.    ERISA § 3(14), 29 U.S.C. § 1002(14), defines a "party in interest" to include (A) "any fiduciary . . . of such employee benefit plan;" (B) "a person providing services to such plan;" (C) "an employer any of whose employees are covered by such plan," and "(H) any employee, officer, or director of such employer."

135.    ERISA § 3(9), 29 U.S.C. § 1002(9) defines "person" as "an individual, partnership, joint venture, corporation, mutual company, joint-stock company, trust, estate, unincorporated organization, association, or employee organization."

136.    Defendants' decision to agree to pay excessive fees to Lincoln as recordkeeper for the Plan amounted to a direct or indirect "furnishing of goods, services, or facilities between the plan and a party in interest" pursuant to ERISA § 406(a)(1)(C) and the "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan" pursuant to ERISA § 406(a)(1)(D).

137.    Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants, as fiduciaries to the Plan, are liable to restore to the Plan all losses caused by their violations of ERISA §§ 406(a)(1)(C) and (D).

<b><u>PRAYER FOR RELIEF</u></b>

**WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A.    A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B.    Designation of Plaintiffs as Class Representatives and designation of Plaintiff's counsel as Class Counsel;

C.    A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D.    An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of

34

the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.    An order requiring the Company Defendant to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Company Defendant as necessary to effectuate said relief, and to prevent the Company Defendant's unjust enrichment;

F.    Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.    An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.    Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan's fiduciaries deemed to have breached their fiduciary duties;

I.    An award of pre-judgment interest;

J.    An award of costs pursuant to 29 U.S.C. § 1132(g);

K.    An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L.    Such other and further relief as the Court deems equitable and just.

Dated:  June 16, 2025

**CAPOZZI ADLER, P.C.**
Mark K. Gyandoh, Esquire
PA Atty. ID 88587
James A. Maro, Esquire
PA Atty. ID 86420
312 Old Lancaster Road
Merion Station, PA 19066

35

Email: markg@capozziadler.com
        jamesm@capozziadler.com
Tel.: (610) 890-0200
Fax: (717) 232-3080

*Counsel for Plaintiffs and the Putative Class*